1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10

REBEKKA LANGLOIS,

CASE NO. C04-5842RJB

11

Plaintiff,

12

v.

REPORT AND
RECOMMENDATION

13

JO ANNE B. BARNHART, Commissioner of
Social Security,

Noted for December 23, 2005

14
15

Defendant.

16
17
18
19
20
21
22
23

Plaintiff, Rebekka Langlois, has brought this matter for judicial review of the denial of her

24

application for supplemental security income ("SSI") benefits.  This matter has been referred to the

25

undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR

26

4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After

27

reviewing the parties' briefs and the remaining record, the undersigned submits the following report and

28

recommendation for the Honorable Robert J. Bryan's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is thirty-five years old.[1] Tr. 39.  She has an eleventh-grade education and past work experience as a housekeeper and fast food worker. Tr. 16, 74, 79.

Plaintiff filed an application for SSI benefits on October 11, 1984. Tr. 15.  That application was granted effective October 1984, apparently based on a mental impairment.  Id.  Plaintiff also apparently continued to receive SSI benefits, until those benefits were terminated in December 1994, after she had married. Id.

Plaintiff protectively filed another application for SSI benefits on November 7, 2001, alleging disability as of November 13, 1999, due to a bipolar disorder and chronic back pain. Tr. 15, 39, 67-69, 73. Her application was denied initially and on reconsideration. Tr. 39-42, 48, 51.  Plaintiff requested a hearing, which was held on July 22, 2003, before an administrative law judge ("ALJ"). Tr. 429.  At the hearing, plaintiff, represented by counsel, appeared and testified. Tr. 429-65.

On December 17, 2003, the ALJ issued a decision determining plaintiff to be not disabled, finding specifically in relevant part as follows:

(1)   at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability;

(2)   at step two, plaintiff had "severe" impairments consisting of a mood disorder not otherwise specified, rule out bipolar disorder, rule out methamphetamine induced mood disorder, and polysubstance abuse in partial remission;

(3)   at step three, plaintiff's impairments met the criteria of section 12.09 (substance addiction disorders) of 20 C.F.R. Part 404, Subpart P, Appendix 1, but did not meet or equal any other impairments listed in that appendix;

(4)   at step four, (i) plaintiff had the residual functional capacity to perform work with no physical restrictions, but which limited her to simple, repetitive tasks and no direct work with the public, (ii) she had the residual functional capacity to perform a significant range of work when not abusing drugs or alcohol, and (iii) she had no past relevant work; and

(5)   at step five, without considering limitations imposed by drug and alcohol abuse, plaintiff was capable of performing other work existing in significant numbers in the national economy.

Tr. 25-26.  Plaintiff's request for review was denied by the Appeals Council on October 13, 2004, making the ALJ's decision the Commissioner's final decision. Tr. 5; 20 C.F.R. § 416.1481.

_____
[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 2

On December, 2004, plaintiff filed a complaint in this court seeking judicial review of the ALJ's decision. (Dkt. #1, #4 and #5). Plaintiff argues that decision should be reversed and remanded to the Commissioner to determine whether she met the income guidelines for SSI benefits during the period of December 6, 2001 to February 1, 2004, or, in the alternative, to issue a new decision based on substantial evidence and the proper legal standards, for the following reasons:

(a)    the ALJ failed to rebut the presumption of plaintiff's continuing disability;

(b)    the ALJ improperly determined that substance abuse was a material factor contributing to her disability;

(c)    the ALJ erred in assessing plaintiff's residual functional capacity;

(d)    the ALJ erred in assessing plaintiff's credibility;

(e)    the ALJ erred in evaluating the lay witness evidence in the record; and

(f)    the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in finding plaintiff not disabled, but for the reasons set forth below, finds the court should remand to the Commissioner for further administrative proceedings.

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.    The ALJ Did Not Improperly Fail to Rebut the Presumption of Disability

Plaintiff asserts the Commissioner granted her application for SSI benefits in October 1984, due to mental retardation. Plaintiff's Opening Brief, p. 12. Plaintiff further asserts the ALJ failed to follow the steps set forth in 20 C.F.R. § 416.994 to determine whether her condition had medically improved to the

point where she was no longer mentally retarded. Id. Specifically, she argues the ALJ failed to consider medical and other evidence in the record, including her school records, which supported a presumption of continuing disability based on that impairment. The undersigned disagrees.

A.    Presumption of Continuing Disability

The undersigned finds 20 C.F.R. § 416.994 to be inapplicable here. That regulation sets forth the procedure by which the Commissioner will decide whether an adult claimant's disability is to continue or end. Id. It states that if a claimant is "entitled to disability benefits as a disabled person age 18 or over (adult)" the Commissioner will consider a number of factors in deciding whether the claimant's disability continues. 20 C.F.R. § 416.994(b) (emphasis added). It thus does not appear to contemplate the kind of situation, such as this one, where benefits had been denied several years prior to the filing of a current application, and the record does not show the prior termination of benefits had been challenged. Therefore, while it seems that plaintiff's SSI benefits may have been ended because she married, rather than due to an improvement in her medical condition, one can presume that the decision to terminate those benefits at that time was made because she was no longer entitled to them.[2]

Plaintiff appears to argue that the fact that the record of her prior application is not available should not be held against her, because there is not any evidence that the ALJ inquired about that record or that it was destroyed, and thus was unavailable. Plaintiff's Opening Brief, p. 12. At the hearing, however, the ALJ did state that she tried to obtain the record, but that it had been destroyed. Tr. 432. It is not clear if plaintiff is challenging the ALJ's credibility on this issue, but the undersigned finds no basis in the record for discounting it. Plaintiff's counsel, furthermore, stated that plaintiff's mother might have a copy of the record, and that she would talk to her to see if it was still in her possession. Tr. 433, 435. The ALJ even left the record open for a month, but there is no indication that any additional records were submitted. Tr.

---

[2]For the same reason, the two district court cases cited by plaintiff to support her argument are inapposite. See Saltzman v. Apfel, 125 F. Supp.2d 1014, 1019 (C.D. Cal 2000) ("'Once a claimant has been found to be disabled, . . . a presumption of continuing disability arises in [his] favor[, and the Commissioner] bears the burden of producing evidence sufficient to rebut this presumption of continuing disability.'") (quoting Bellamy v. Secretary of Health & Human Serv., 755 F.2d 1380, 1381 (9th Cir. 1985); see also Mendoza v. Apfel, 88 F. Supp.2d 1108, 1113 (C.D. Cal 2000). In Salzmann, a claimant, who had been receiving disability insurance benefits for nearly four years, challenged the Commissioner's determination to terminate his benefits due to his alleged substance abuse. 755 F.2d at 1017. In Mendoza, the ALJ had determined that while the claimant had established disability for a certain limited period of time, he then had shown considerable improvement to the point where he was no longer disabled. Id. at 1112. Neither case, however, involved the situation here where plaintiff's SSI benefits were terminated nearly seven years prior to her current application for such benefits, and there is no evidence that the prior termination was ever challenged.

REPORT AND RECOMMENDATION
Page - 4

1   463-64.  Thus, the ALJ should not be faulted for her efforts to obtain the prior record.

2          It also is not clear from the record that plaintiff's prior grant of SSI benefits was even due to mental

3   retardation.  The only evidence in the record concerning the reason she originally was granted such benefits

4   came from testimony provided by her counsel and her own report to one of her examining psychiatrists.  At

5   the hearing, plaintiff's counsel stated that she talked to plaintiff's mother, who had told her that it was due

6   to plaintiff's "mental problems" and being in special education. Tr. 433.  In early February 2002, plaintiff

7   told Dr. Roger Mah that she received SSI benefits from age 12 to age 24 "for unknown reasons," but that

8   she believed "it had something to do with her being in special education when she was in school." Tr. 254.

9   As discussed below, however, the ALJ did not err in discounting plaintiff's credibility.  In addition, such

10  evidence, even if credible, is in itself hardly proof that plaintiff's grant of SSI benefits was based on mental

11  retardation, though it may be indicative of some sort of learning difficulties.

12         Plaintiff also points to I.Q. testing conducted while she was in school, showing scores in the range

13  of 66 to 75, as documentation of her mental retardation. Tr. 28; Plaintiff's Opening Brief, p. 12.  However,

14  that testing was performed in late September 1998, more than four years after plaintiff's prior application

15  for SSI benefits had been granted. Tr. 28.  In addition, those scores were handwritten on a one page form,

16  with little in the way of accompanying explanatory information. Id.  A more comprehensive summary of

17  plaintiff's psychological testing also is in the record, indicating that her I.Q. scores at that time actually fell

18  within the range of 73 to 75, which was noted to be in the "borderline" range of performance. Id.  Thus,

19  while it is possible benefits were granted on the basis of low intellectual functioning, the dearth of evidence

20  in the record concerning mental retardation, and the questions noted above regarding plaintiff's actual I.Q.

21  scores, simply do not establish the existence of that impairment.

22         Plaintiff further argues in her reply brief that her I.Q. test scores show that she received her prior

23  grant of SSI benefits because she met or equaled the criteria for mental retardation under 20 C.F.R. Part

24  404, Subpart P, Appendix 1, § 12.05(C) ("Listing 12.05(C)"). Plaintiff's Reply Brief, p. 2.  Even if the court

25  ignores the fact that, as discussed above, the scores plaintiff refers to were obtained long after she initially

26  was granted SSI benefits, the evidence in the record does not definitively show she would have met the

27  requirements of Listing 12.05(C). That Listing reads in relevant part:

28          12.05 Mental retardation: Mental retardation refers to significantly subaverage general
            intellectual functioning with deficits in adaptive functioning initially manifested during

the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . .

To meet the first criteria of Listing 12.05(C), the claimant's IQ score must be "valid." Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999). The medical and other evidence in the record can "cast doubt on the validity" of that score. Id. With respect to the second criteria, the ALJ assesses "the degree of functional limitation" the additional impairment imposes to determine if it "significantly limits" the claimant's "physical or mental ability to do basic work activities," i.e., if the impairment is "severe" as defined in 20 C.F.R. § 416.920(c). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).

In addition to the above two criteria, the claimant must demonstrate his or her impairment "satisfies the diagnostic description" for Listing 12.05 contained in the explanatory material for mental disorders under 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00. See Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)). The Commissioner's regulations provide specifically that:

Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) (emphasis added). To be found disabled under Listing 12.05(C), therefore, plaintiff also must show that she had "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" prior to age 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).

First, as discussed above, it is not at all clear that the I.Q. scores obtained in September 1998, meet the first criteria of Listing 12.05(C), even assuming such scores were valid and ignoring the timing issue also discussed above. In addition, the evidence in the record concerning plaintiff's adaptive behavior and academic performance from that time does not necessarily satisfy the second criteria. See Tr. 29. That is, simply because plaintiff's adaptive behavior and academic performance fall below that of the majority of her peers, does not in itself establish her mental capacity to do basic work activities were significantly limited as

1    contemplated by Listing 12.05(C).  Similarly, it is not certain that such evidence shows plaintiff would have

2    satisfied the diagnostic description for Listing 12.05(C) during the relevant time period.  As such, the

3    additional issue of whether psychological testing conducted by Daniel M. Neims, Ph.D., in late July 2003,

4    supports plaintiff's argument that medical improvement has not occurred is moot.[3]

5            B.    Administrative *Res Judicata*

6            The real issue here thus appears to be more properly one of administrative *res judicata*, rather than a

7    presumption of continuing disability.  Judicial review of the Commissioner's administrative decisions is

8    governed by Section 405(g) of the Social Security Act, which reads in relevant part:

9            Any individual, after any final decision of the Commissioner of Social Security made
             after a hearing to which he was a party, irrespective of the amount in controversy, may
10           obtain a review of such decision by a civil action commenced within sixty days after the
             mailing to him of notice of such decision or within such further time as the Secretary
11           may allow.

12   42 U.S.C. § 405(g); see also Udd v. Massanari, 245 F.3d 1096, 1098 (9th Cir. 2001) (judicial review limited

13   to final decision made after hearing).  The Commissioner's regulations, however, "allow for further

14   consideration of an application by providing for the reopening of an agency determination." Panages v.

15   Bowen, 871 F.2d 91, 92 (9th Cir. 1989).  Under those regulations, "[a] claim may be reopened within 12

16   months of the initial determination as a matter of right, within four years 'upon a finding of good cause,'

17   and at any time for the purpose of correcting clear evidentiary errors or clerical mistakes." Id. (quoting and

18   citing 20 C.F.R. §§ 404.988-404.989).

19           The Commissioner may apply administrative *res judicata* "to bar reconsideration of a period with

20   respect to which she has already made a determination, by declining to reopen the prior application." Lester

21   v. Chater, 81 F.3d 821, 827 (9th Cir. 1996).  In general, the Commissioner's refusal to reopen a decision

22   regarding an earlier period "is not subject to judicial review." Id.  This is because, once an administrative

23   decision becomes final, the Commissioner's decision to reopen a disability claim is "purely discretionary."

24   Taylor v. Heckler, 765 F.2d 872, 877 (9th Cir. 1985).  Further, since a discretionary decision is not a "final

25   decision" within the meaning of 42 U.S.C. § 405(g), the Commissioner's refusal to reopen that decision "is

26   _____

27           [3]Plaintiff asserts the ALJ should have compared that testing with her prior I.Q. scores to determine whether such medical
     improvement had occurred.  Again, however, it appears plaintiff's actual I.Q. scores obtained at the time may have been higher
28   than that required to meet or equal the criteria of Listing 12.05(C).  Further, the fact that plaintiff may have tested at the first and
     second grade levels for spelling and mathematics respectively as found by Dr. Neims (Tr. 387), does not in itself establish a
     finding of mental retardation or the existence of another mental impairment equivalent in severity thereto.  Indeed, while Dr.
     Neims diagnosed plaintiff with a learning disorder, he did not find that she was mentally retarded. Id.

REPORT AND RECOMMENDATION
Page - 7

1   not a 'final' decision subject to judicial review." Id. (citations omitted).

2        The doctrine of *res judicata* "should not be rigidly applied in administrative proceedings." Lester v.

3   Chater, 81 F.3d 821, 827 (9th Cir. 1996); Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988) (*res judicata*

4   applied less rigidly to administrative proceedings than to judicial proceedings).  While administrative *res*

5   *judicata* also should not be "applied so as to 'contravene an overriding public policy or result in manifest

6   injustice,'" it is only "[w]here the record is patently inadequate to support the findings the ALJ made," that

7   its application will be "tantamount to a denial of due process." Krumpelman v. Heckler, 767 F.2d 586, 588

8   (9th Cir. 1985) (quoting Thompson v. Schweiker, 665 F.2d 936, 940-41 (9th Cir. 1982)).

9        The exception to the above rule is "where the Commissioner considers 'on the merits' the issue of

10  the claimant's disability during the already-adjudicated period." Lester, 81 F.3d at 827; Lewis v. Apfel, 236

11  F.3d 503, 510 (9th Cir. 2001).  If "such a *de facto* reopening occurs, the Commissioner's decision as to the

12  prior period is subject to judicial review." Lester, 81 F.3d at 827.  However, "where the discussion of the

13  merits is followed by a specific conclusion that the claim is denied on res judicata grounds, the decision

14  should not be interpreted as re-opening the claim and is therefore not reviewable." Krumpelman, 767 F.2d

15  at 589 (citing McGowen v. Harris, 666 F.2d 60, 68 (4th Cir. 1981)).

16       In this case, the ALJ found that because she did not have a copy of the prior decision terminating

17  plaintiff's SSI benefits, or the reasons why plaintiff initially was found to be disabled, she was unable to

18  determine whether that application was subject to reconsideration. Tr. 15.  The ALJ, therefore, proceeded

19  as if plaintiff's current application was the first time she had applied for SSI benefits. Id.  In light of the

20  dearth of evidence in the record regarding plaintiff's prior application discussed above, the undersigned

21  does not find any impropriety with the ALJ's determination to proceed without first making a finding of

22  medical improvement under 20 C.F.R. § 416.994.

23  II.    The ALJ Erred in Finding Plaintiff's Substance Abuse to Be a Materially Contributing Factor and in
           Assessing Plaintiff's Residual Functional Capacity

24
25       A claimant may not be found disabled if alcoholism or drug addiction would be "a contributing

    factor material to the Commissioner's determination" that the claimant is disabled. Bustamante v.
26
    Massanari, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)).  Similarly,
27
    the Social Security Regulations also require that the Commissioner determine whether "drug addiction or
28
    alcoholism is a contributing factor material to the determination of disability." Id. (citing 20 C.F.R. §§

REPORT AND RECOMMENDATION
Page - 8

1 | 404.1535(a), 416.935(a)).

2 |       To determine whether a claimant's alcoholism or drug addiction is a materially contributing factor,

3 | the ALJ first must conduct the five-step disability evaluation process "without separating out the impact of

4 | alcoholism or drug addiction." <u>Id</u>. at 955.  If the ALJ finds the claimant is not disabled, "then the claimant is

5 | not entitled to benefits." <u>Id</u>.  If the claimant is found disabled "and there is 'medical evidence of [his or her]

6 | drug addiction or alcoholism,'" the ALJ proceeds "to determine if the claimant 'would still [be found]

7 | disabled if [he or she] stopped using alcohol or drugs.'" <u>Id</u>. (citing 20 C.F.R. §§ 404.1535, 416.935).  Thus,

8 | if a claimant's current limitations "would remain once he [or she] stopped using drugs and alcohol," and

9 | those limitations are disabling, "then drug addiction or alcoholism is not material to the disability, and the

10 | claimant will be deemed disabled." <u>Ball v. Massanari</u>, 254 F.3d 817, 821 (9th Cir. 2001).

11 |       Here, the ALJ found at step three of the disability evaluation process that plaintiff met the criteria of

12 | 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.09, substance addiction disorders. Tr. 16.  The ALJ

13 | further found, however, that plaintiff would not be disabled if she stopped her substance abuse:

14 |     [W]ithout considering the limitations imposed by the claimant's polysubstance abuse, I
   |     find that she could make an adjustment to work available in significant numbers in the

15 |     national economy.  This conclusion is based on findings concerning her age, education,
   |     work experience, and residual functional capacity.  For this reason, the claimant is

16 |     ineligible to receive benefits by virtue of her application for Supplemental Security
   |     Income payments.  Drug addiction and/or alcoholism are contributing factors material to

17 |     the determination of disability.

18 | <u>Id</u>.

19 |       Plaintiff first argues that in so finding, the ALJ failed to consider the medical evidence in the record

20 | regarding the impact of her mental retardation and low intellectual functioning on her ability to work.  As

21 | discussed above, the evidence in the record does not establish that plaintiff was granted SSI benefits based

22 | on mental retardation, and thus does support the ALJ's decision not to consider whether plaintiff's medical

23 | condition had improved from when she previously was granted such benefits.  In addition, there is little in

24 | the way of medical evidence in the record to show that plaintiff's ability to work was significantly limited by

25 | her low intellectual functioning, even during periods of substance abuse.

26 |       A mental status examination conducted by Dr. Joy Ruiz-Molleston in late January 2001, was for the

27 | most part unremarkable. Tr. 213.  She made no findings concerning mental retardation or low intellectual

28 | functioning. Tr. 191, 214.  A mental status examination performed by Patrick O'Donnell around the same

time also was largely unremarkable. Tr. 192.  While Dr. O'Donnell found her intellectual functioning to be "quite low," this was not formally tested. Tr. 192, 194.  In any event, he found no work-related limitations resulting from her low intellectual functioning, nor did he diagnose her with either mental retardation or a learning disorder. Tr. 194.  In late February 2002, Dr. Antonio Gutierrez diagnosed plaintiff with both a mood disorder and a personality disorder, but he too made no findings regarding mental retardation or low intellectual functioning, let alone any work-related limitations resulting therefrom. Tr. 245.

Although Dr. Roger Mah found plaintiff to have several work-related mental functional limitations around that time, there is no indication that these limitations were due to any problems with her intellectual functioning. Tr. 259-61.  Indeed, as with those medical sources noted above, neither mental retardation nor low intellectual functioning was diagnosed. Tr. 259.  Similarly, while Thomas Clifford, Ph.D., and Janis Lewis, Ph.D., the two non-examining consulting psychologists in the record, found plaintiff had a number of mental functional limitations as well, they only diagnosed her with a bipolar disorder. Tr. 277-93.  The same is true with respect to the two state psychological/psychiatric evaluation forms completed by Michael Corpolongo, Ph.D., in late September 2002, and late February 2003.[4] Tr. 339-46.

The only examining psychiatrist or psychologist in the record who actually diagnosed plaintiff with either mental retardation or low intellectual functioning was Dr. Daniel M. Neims, who diagnosed her with a learning disorder, not otherwise specified in late July 2003. Tr. 387.  He opined, however, that "[m]any questions regarding her intellectual funds" remained "unanswered." Tr. 388.  Nevertheless, he estimated her intellectual functioning was "within the mid to upper borderline range" based on psychological testing he had administered. Id.  Thus, even the findings of Dr. Neims, upon which plaintiff relies to a large extent, fail to establish that plaintiff was mentally retarded or had such deficits in intellectual functioning so as to significantly limit her ability to perform work-related activities.

Plaintiff next argues the ALJ erred in finding that she had the residual functional capacity to work during those times when she was not using drugs or alcohol.[5] If a disability determination "cannot be made

---

[4]Dr. Corpolongo did diagnose plaintiff with a cognitive disorder, not otherwise specified, in late February 2003, but did not further specify the nature of that disorder. Tr. 344.

[5]Plaintiff further argues the ALJ did not comply with Social Security Ruling ("SSR") 96-8p, which sets forth the standard for assessing a claimant's residual functional capacity. See 1996 WL 374184.  Specifically, plaintiff asserts the ALJ failed to provide "a thorough discussion and analysis of the objective medical evidence regarding her mental impairments." Plaintiff's

on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  Residual functional capacity thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Specifically, plaintiff asserts the ALJ did not consider all of the mental functional limitations found by her examining psychiatrists and psychologists during the periods when she was not abusing substances. The undersigned agrees.  The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

---

Opening Brief, p. 25. For the reasons discussed below, the undersigned finds the ALJ erred in evaluating the medical opinion evidence in the record regarding plaintiff's mental impairments. While not essential to the resolution of this matter, to the extent such error also constitutes a failure to comply with SSR 96-8p, the ALJ erred in this respect as well.

1  thereof, and making findings." <u>Id.</u>  The ALJ also may draw inferences "logically flowing from the evidence."

2  <u>Sample</u>, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the

3  ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

4       The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

5  either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

6  treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

7  legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However, the

8  ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739

9  F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

10 why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07

11 (3d Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

12      In general, more weight is given to a treating physician's opinion than to the opinions of those who

13 do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

14 a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or

15 "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190,

16 1195 (9th Cir.,2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242

17 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

18 opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A nonexamining physician's opinion may

19 constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-

20 31; <u>Tonapetyan</u>, 242 F.3d at 1149.

21      Here, the ALJ found plaintiff had the following residual functional capacity:

22      The evidence . . . supports a finding that the claimant has no physical limitations.
        Without considering the limitations imposed by her substance abuse, I conclude that the
23      claimant retains the residual functional capacity to perform simple and repetitive tasks.
        Due to irritability, she should not work with the public.
24
   Tr. 23.  The ALJ then explained his findings as follows:
25
        In arriving at this residual functional capacity, I have assigned some weight to the
26      opinions of Dr. O'Donnell and Dr. Ruiz-Molleston.  However, I note that
        methamphetamine dependence was a significant factor when they evaluated the claimant.
27      I assign significant weight to the opinion of Dr. Gutierrez who assessed a GAF [global
        assessment of functioning] score of 55.  I assign substantial weight to the opinion of Dr.
28      Mah, although he saw the claimant on only one occasion.  Dr. Mah performed a
        thorough evaluation and the claimant appeared to be fairly forthright in that evaluation.

REPORT AND RECOMMENDATION
Page - 12

> I assign some weight to the opinion of Dr. Neims, but note that the claimant's self report contained some inconsistencies in that evaluation. I assign somewhat less weight to the opinion of Dr. Corpolongo since he was unaware of the claimant's ongoing marijuana use. I assign significant weight to the findings of Dr. Clifford and Dr. Lewis, but note that they were not able to review all of the medical evidence (Social Security Ruling 96-6p).

Tr. 23-24. The undersigned finds the ALJ's assessment of plaintiff's residual functional capacity to be not well supported by his analysis of the above medical evidence in the record.

In late January 2001, Dr. Ruiz-Moelleston gave plaintiff a mental status examination, which was largely unremarkable. Tr. 213. She diagnosed plaintiff as having "[p]olysubstance dependence involving methamphetamine and marijuana." Tr. 214. She did not provide an opinion as to any work-related mental functional limitations. Tr. 190, 211-14. Plaintiff also was evaluated by Dr. O'Donnell at that time. Dr. O'Donnell diagnosed her with bipolar I disorder, mixed, methamphetamine dependence, and a global assessment of functioning ("GAF") score of 32, which he noted to be a "major impairment." Tr. 193. Dr. O'Donnell further opined that while plaintiff's intellectual functioning was "quite low," she used drugs "to balance out the highs and lows," which "only increased her troubles." Tr. 194.

It is true that Dr. Ruiz-Molleston found plaintiff had a bipolar I disorder as well in early February 2001. Tr. 191. It appears, however, that plaintiff still was using methamphetamine through approximately July of that year (Tr. 243), and, in any event, Dr. Ruiz-Molleston did not find she had any work-related mental functional impairments due to that disorder at the time (Tr. 191). Thus, the undersigned finds the ALJ did not err in discounting the opinions of Drs. O'Donnell and Ruiz-Molleston at least in part due to plaintiff's substance abuse at the time. The undersigned also finds no error with the ALJ's evaluation of the report provided by Dr. Gutierrez, as the findings contained in that report do not appear to conflict with the ALJ's assessment of plaintiff's residual functional capacity. See Tr. 243-45.

On the other hand, it seems that although the ALJ assigned "substantial weight" to the opinion of Dr. Mah, she did not adopt all of the mental functional limitations he found plaintiff had. Dr. Mah found that due to her mixed bipolar I disorder, plaintiff was mildly to moderately limited in her activities of daily living and moderately limited in her social functioning. Tr. 259-60. With respect to her mental abilities to do work-related activities, Dr. Mah found in relevant part as follows:

> The claimant's ability to reason, understand and think is only fair. She seems to have some difficulty understanding and grasping the nature of questions at times, her level of abstraction appears to be concrete, and she may have some difficulty in judgment.

Memory is also fair, but she appears to be able to carry out and understand simple instructions but might have difficulty understanding more detailed, complex instructions. She would also have difficulty because of her poor reading and writing skills. Concentration, persistence and pace are fair to poor. . . . her ability to sustain attention might be impaired due to her mood lability, racing thoughts, and irritability. Her primary difficulties appear to be in the area of her social skills and functioning, however.

Tr. 260.  Dr. Mah went on to state that plaintiff's prognosis for improvement and recovery was "guarded," and that her bipolar symptoms might "interfere with her ability to function in a stable, consistent manner, expecially given her numerous situational stresses and changes." Tr. 261.  Dr. Mah hoped that psychiatric medication management would "help stabilize her mood," "minimize relapse," and "increase function," but noted that plaintiff was "just beginning to receive appropriate treatment." Id.  While the ALJ's limitation to simple, repetitive tasks and no working with the public covers some of these limitations, it clearly does not address all of them.  To that extent, the ALJ erred.

The ALJ assigned "significant weight" to the findings of Drs. Clifford and Lewis, who found on a mental residual functional capacity assessment form they completed in early February 2002, plaintiff to be markedly limited in her ability to understand, remember and carry out detailed instructions, and moderately limited in her ability to: maintain attention and concentration; perform activities within a schedule, maintain regular attendance; be punctual; work in coordination with or proximity to others; make simple work-related decisions; complete a normal workday and workweek; perform at a consistent pace; get along with co-workers or peers; and respond appropriately to changes in the work setting. Tr. 277-78.  They also found her to be mildly to moderately limited in her ability to sustain an ordinary routine. Tr. 277.  On that form, Dr. Clifford and Dr. Lewis further opined that plaintiff's "moodiness" might be a factor, but that she seemed "quite capable of goal directed behavior." Tr. 279.  In addition, it was noted that while plaintiff might "need some specific direction to adapt to changes due to learning problems," she had the "capacity for work adaptation." Id.

On a psychiatric review technique form they completed at the same time, Drs. Clifford and Lewis found plaintiff mildly restricted in her activities of daily living, and to have mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. Tr. 291.  They also stated that Dr. Mah's conclusions were "fully consistent" with the "bulk" of the evidence in the record. Tr. 293.  Nevertheless, as with Dr. Mah's opinion, the ALJ adopted only two of the many moderate to marked limitations found by Dr. Clifford and Dr. Lewis, even

though the ALJ gave their findings and those of Dr. Mah "significant" and "substantial" weight.  Again, to this extent, the ALJ erred in assessing plaintiff's residual functional capacity.

In late September 2002, plaintiff was evaluated by Dr. Corpolongo, who diagnosed her with a recurrent bipolar disorder, an avoidant personality disorder, a posttraumatic stress disorder ("PTSD"), and methamphetamine dependency in sustained full remission. Tr. 340.  Dr. Corpolongo found her markedly limited in her ability to: understand, remember and follow complex (more than two step) tasks, learn new tasks, exercise judgment and make decisions, relate appropriately to co-workers and supervisors, interact appropriately in public contacts, respond appropriately to and tolerate the pressures and expectations of a normal work setting, control her physical or motor movements; and maintain appropriate behavior. Tr. 341.  He also found plaintiff to be moderately limited in her ability to understand, remember and follow simple instructions, and mildly to moderately limited in her ability to perform routine tasks. Id.  Dr. Corpolongo made similar, though somewhat less severe, findings in late February 2003. Tr. 343-45.

The ALJ assigned "somewhat less weight" to Dr. Corpolongo's opinion, because he was unaware of plaintiff's "ongoing marijuana use."   However, it is unclear from the record that plaintiff was actually using marijuana during the two times she was evaluated by Dr. Corpolongo.  It is true  plaintiff testified at the hearing, which was held on July 22, 2003, that the last time she used marijuana was "five weeks ago." Tr. 445.  This alone though, does not establish that plaintiff was using marijuana back in 2002.  In addition, even if it was true that plaintiff was using marijuana that year and Dr. Corpolongo was not aware of this, he gave no indication that he felt plaintiff was under the influence of or otherwise affected by drugs or other similar substances during either evaluation.  Accordingly, the undersigned also finds the ALJ's reason for discounting Dr. Corpolongo's findings to be insufficient as well.

In late July 2003, Dr. Neims evaluated plaintiff, diagnosing her with chronic PTSD, panic attacks with agoraphobia, and a learning disorder, a bipolar II disorder, a personality disorder with avoidant and dependent traits, and a GAF score of 48 (the highest score in the past year being 49). Tr. 387-88.  He also estimated plaintiff's intellectual functioning to be "within the mid to upper borderline range," although he felt that many questions regarding her functioning in that area "remained unanswered." Tr. 388.  The ALJ assigned Dr. Neims' opinion only "some weight," because plaintiff's self-report during the evaluation had "some inconsistencies," but did not state what those inconsistencies were.  This reason for discounting Dr.

Neims' opinion regarding plaintiff's mental impairments thus also is insufficient.  Although Dr. Neims did not opine as to any specific work-related limitations, it is not clear the ALJ gave adequate consideration to the many mental impairments he found plaintiff had.

III.    The ALJ Properly Assessed Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  The court should not "second-guess" this credibility determination.  Allen, 749 F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief."  Lester, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints."  Lester, 81 F.3d at 834; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms.  Id.

The ALJ discounted plaintiff's credibility due to inconsistencies in her prior statements concerning her symptoms.  This was proper.  See Id.  For example, the ALJ noted as follows:

> It is clear from the record that she initially stopped working to undergo substance abuse treatment after relapse on methamphetamine (Exhibit 7F).  She later attempted to work at a fast food restaurant, but she reported that she quit due to concerns about co-workers who were using marijuana. . . . She told Dr. Mah that "If people were not using marijuana, I'd still be working there."  The claimant also told Dr. Mah that she had no difficulty performing that job and was not fired (Exhibit 8F).  She later contradicted

herself when she told Dr. Neims that she was fired due to problems with pace and memory. At the hearing, she again contradicted herself and reported having quit due to problems keeping up with the pace. Her reasons for quitting this job are, thus suspect and is suggestive of a lack of motivation to work rather than inability.

Tr. 22-23, 254, 385, 440-41. The record further shows that although plaintiff reported to Dr. Mah that she lost her job as a motel housekeeper in 2000, because she "relapsed on" methamphetamine and "went into treatment," she indicated to Dr. Neims and testified at the hearing that she was unable to continue in that job due to "problems with her back and issues of poor pace." Tr. 23, 254, 385, 441.

The ALJ noted additional inconsistencies in plaintiff's statements and testimony. Plaintiff told Dr. Mah that she was unable to read or write, but then subsequently stated that she read occasionally and will read the horoscopes in the newspaper. Tr. 23, 257, 259. It also appears that plaintiff has reported both that she has a general equivalency diploma and did not obtain one. Tr. 208, 244, 252, 257, 385. In addition, the undersigned notes that she has provided conflicting reasons for not having a driver's license. For example, plaintiff told Dr. Mah that she had "a suspended license for noninsurance." Tr. 257. However, she later told Dr. Neims and testified at the hearing that she never had a driver's license because she was unable to pass the written part of the driver's license examination. Tr. 386, 437-38. The ALJ, furthermore, pointed out that plaintiff claimed to isolate socially, but reported "multiple social activities." Tr. 23. While the evidence is mixed regarding the extent of those activities (Tr. 252, 259, 386), a credibility determination will not be reversed based on ambiguous evidence. Allen, 749 F.2d at 580.

The ALJ also discounted plaintiff's credibility because of a "poor work record" that suggested "a lifestyle choice not to work." Tr. 23. Specifically, with respect to plaintiff's work history, the ALJ found as follows:

> [T]he claimant's work history does not suggest that she is motivated to work outside the home. She was primarily a homemaker during her marriage with reported lifetime earnings of only $3,647.02 (Exhibit 4D). The record reflects that the claimant was able to work as a housekeeper during a period in which her monthly drug tests were clean. . . . I note that the claimant's public assistance benefits provide a disincentive for her to return to work. I further note that her continued marijuana use likely does little for her motivation to join the workforce (Exhibit 7F).

Id. The ALJ may consider a claimant's prior work record, "[m]otivation and the issue of secondary gain" in rejecting symptom testimony. See Smolen, 80 F.3d at 1284; Tidwell, 161 F.3d at 602; Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992); Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (ALJ properly found claimant's extremely poor work history and lack of propensity to work in her

lifetime negatively affected her credibility regarding her inability to work).

It is questionable whether the use of marijuana and receipt of public assistance benefits alone can be said to negatively impact an individual's motivation to work. However, the record does reflect that plaintiff has a poor earnings history, even prior to her alleged onset date of disability, and that she was able to work for quite some time as a housekeeper after that date. <u>See</u> Tr. 71, 192, 208, 257. As such, the ALJ did not err in discounting plaintiff's credibility for these reasons as well.

The ALJ further discounted plaintiff's credibility in part for the following reason:

> She reported that she stopped taking Depakote after her release from the hospital in February of 2001. The claimant subsequently did not take psychotropic medications or seek psychiatric treatment for a year. This is suggestive that her symptoms are not as severe as she claims as one with symptoms of the severity alleged would most likely seek regular and ongoing care. . . . After seeing Dr. Gutierrez [in late January 2002], the claimant did not seek further treatment for her psychiatric complaints until September of 2002. I further note that when she did finally seek treatment it was due to grief over the recent death of her significant other.

Tr. 23, 190-94, 211-14, 243-45, 358-93. This too, was a proper basis for discounting plaintiff's credibility. Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain testimony." <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989).  <u>see also</u> <u>Meanal v. Apfel</u>, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly considered physician's failure to prescribe, and claimant's failure to request serious medical treatment for supposedly excruciating pain); <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ properly found prescription of physician for conservative treatment only to be suggestive of lower level of pain and functional limitation).

Lastly, the ALJ found plaintiff's credibility to be lessened due to her continued use of drugs. Tr. 23. As discussed above, however, use of drugs alone does not necessarily impugn a claimant's credibility with respect to symptom testimony and allegations of inability to work. Nevertheless, the fact that one reason for discounting plaintiff's credibility may be improper, does not render the ALJ's credibility determination invalid, as long as that determination is supported by substantial evidence, as it is in this case. <u>Tonapetyan</u>, 242 F.3d at 1148. Accordingly, the undersigned finds no error here.

IV.    <u>The ALJ Erred in Evaluating the Lay Witness Evidence in the Record</u>

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to

1   each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay

2   testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

3   1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting

4   lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for

5   dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those

6   reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may

7   "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

8          Plaintiff argues the ALJ failed to consider the lay witness statements provided by her mental health

9   care therapists and nurse practitioners. Tr. 358-79.  While the undersigned finds the ALJ did consider at

10  least some of these statements (see Tr. 19-20), the ALJ's decision contains no analysis of those statements,

11  nor does it provide any indication what weight, if any, the ALJ gave them.  It is not clear, however, what

12  harm the ALJ's failure to properly analyze these statements caused plaintiff.  Indeed, none of them found

13  plaintiff to suffer from any work-related mental functional limitations.  Thus, the undersigned is inclined to

14  agree with defendant that such error was harmless. See Batson v. Commissioner of the Social Security

15  Administration, 359 F.3d 1190, 1197 (9th Cir. 2004) (applying harmless error standard); Curry v. Sullivan,

16  925 F.2d 1127, 1131 (9th Cir. 1990) (holding ALJ committed harmless error).  Nevertheless, because the

17  undersigned is recommending that this matter be remanded for the other reasons state herein, on remand the

18  Commissioner also shall re-consider the lay witness statements in the record.

19  V.     The ALJ Erred in Finding Plaintiff Capable of Performing Other Jobs Existing in Significant
               Numbers in the National Economy

20

21         If the claimant cannot perform his or her past relevant work at step four of the disability evaluation

22  process, at step five, the ALJ must show there are a significant number of jobs in the national economy the

23  claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d)-

24  (e).  There are two ways that the ALJ can to this: "(a) by the testimony of a vocational expert, or (b) by

25  reference to the [Commissioner's] Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."

26  Tackett, 180 F.3d at 1100-1101 (emphasis in original); see also Osenbrock v. Apfel, 240 F.3d 1157, 1162

27  (9th Cir. 2001).  The ALJ's ability to rely on the Grids is limited, however, as noted by the Ninth Circuit in

28  describing their purpose and function:

           In some cases, it is appropriate for the ALJ to rely on the Medical-Vocational Guidelines

to determine whether a claimant can perform some work that exists in "significant numbers" in the national economy. The Medical-Vocational Guidelines are a matrix system for handling claims that involve substantially uniform levels of impairment. . . .

The Guidelines present, in *table form*, a short-hand method for determining the availability and numbers of suitable jobs for a claimant. These tables are commonly known as "the grids." The grids categorize jobs by their physical-exertional requirements and consist of three separate tables-one for each category: "[m]aximum sustained work capacity limited to sedentary work," "[m]aximum sustained work capacity limited to light work," and "[m]aximum sustained work capacity limited to medium work."[6] . . . Each grid presents various combinations of factors relevant to a claimant's ability to find work. The factors in the grids are the claimant's age, education, and work experience. For each combination of these factors, . . . the grids direct a finding of either "disabled" or "not disabled" based on the number of jobs in the national economy in that category of physical-exertional requirements. *See id.*

This approach allows the Commissioner to streamline the administrative process and encourages uniform treatment of claims. . . .

The Commissioner's need for efficiency justifies use of the grids at step five where they *completely and accurately* represent a claimant's limitations. . . . In other words, a claimant must be able to perform the full range of jobs in a given category, i.e., sedentary work, light work, or medium work.

Tackett, 180 F.3d at 1101 (emphasis in original) (internal citations and footnote omitted).

If, on the other hand, a claimant has "significant non-exertional impairments," those impairments "may make reliance on the grids inappropriate."[7] Id. at 1101-02; see also Osenbrock, 240 F.3d at 1162 (ALJ cannot rely on Grids where claimant has significant non-exertional impairments); Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (Grids inapplicable when they do not completely describe claimant's abilities and limitations). Proper use of the Grids depends in each case upon the nature and extent of the claimant's impairments and limitations:

The ALJ must apply the grids if a claimant suffers only from an exertional impairment . . . In such cases, the rule is simple: the grids provide the answer. Where the grids dictate a finding of disability, the claimant is eligible for benefits; where the grids indicate that the claimant is not disabled, benefits may not be awarded. However, where a claimant suffers solely from a nonexertional impairment . . . the grids do not resolve the disability question . . . other testimony is required. In cases where the claimant suffers from both exertional and nonexertional impairments, the situation is more complicated. First, the grids must be consulted to determine whether a finding of disability can be based on the exertional impairments alone. . . . If so, then benefits must be awarded. However, if the exertional impairments alone are insufficient to direct a

---

[6]However, "[I]f a claimant is found able to work the full range of heavy work this is 'generally sufficient for a finding of not disabled.'" Tackett, 180 F.3d at 1101 n.5 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 204.00).

[7]"Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a(b). "Nonexertional limitations" only affect the claimant's "ability to meet the demands of jobs other than the strength demands." 20 C.F.R. § 404.1569a(c)(1).

conclusion of disability, then further evidence and analysis are required.  In such cases, the ALJ must use the grids as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." . . . In short, the grids serve as a ceiling and the ALJ must examine independently the additional adverse consequences resulting from the nonexertionary impairment.

Cooper v. Sullivan, 880 F.2d 1152, 1155-56 (9th Cir. 1989) (internal citations and footnotes omitted).

Plaintiff argues the ALJ erred in applying the Grids to find her not disabled, without first obtaining the testimony of a vocational expert.  As discussed above, the ALJ erred in evaluating the medical evidence in the record regarding plaintiff's mental functional limitations, and thus improperly assessed her residual functional capacity.  As such, it is not clear that plaintiff has no significant non-exertional impairments.  Indeed, the ALJ's own finding that plaintiff not work with the public, in itself would seem to constitute a significant non-exertional impairment.  Accordingly, application of the Grids alone in this case does not appear to have been appropriate.  This does not necessarily mean that the ALJ was required to obtain the testimony of a vocational expert, although some form of further evidence and analysis regarding plaintiff's ability to perform other jobs was needed.  Nevertheless, on remand, the Commissioner shall re-determine whether such testimony is in fact necessary.

VI.    This Matter Should Be Remanded for Further Administrative Proceedings

The court may remand a case "either for additional evidence and findings or to award benefits." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).  Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Id.; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

(1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because issues remain with respect to plaintiff's residual functional capacity and her ability to perform other jobs existing in significant numbers in the national economy, the court should remand this matter to the Commissioner for further administrative proceedings.

CONCLUSION

Based on the foregoing discussion, the court should find the ALJ improperly concluded plaintiff was

1    not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further

2    administrative proceedings.

3          Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

4    the parties shall have ten (10) days from service of this Report and Recommendation to file written

5    objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

6    objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit

7    imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **December 23,**

8    **2005**, as noted in the caption.

9          DATED this 28th day of November, 2005.

10

11

12                                          Karen L. Strombom

13                                          United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPORT AND RECOMMENDATION
Page - 22